UNITED STATES v. WONG DEP KEN.

(District Court, S. D. California. July 31, 1893.)

No. 437.

1. CHINESE—GEARY ACT—BURDEN OF PROOF—CONSTITUTIONAL LAW
The provision of the "Geary Act" of May 5, 1892, § 3, (27 Stat. 25,) throwing upon a Chinese person accused of being unlawfully in the United States the burden of proof, is not in conflict with the federal constitution. In re Sing Lee, 54 Fed. Rep. 334, approved.

2. SAME—GEARY ACT—DEPORTATION—CONSTITUTIONAL LAW.
The deportation under the Geary act of May 5, 1892, (27 Stat. 25,) of a Chinese person adjudged by a commissioner to be unlawfully in the United States, is not a punishment for crime, within the meaning of the provisions of the federal constitution, securing to persons accused of crime certain rights, including trial by jury. Fong Yue Ting v. U. S., 13 Sup. Ct. Rep. 1016, followed.

3. CONSTITUTIONAL LAW— INFAMOUS CRIME — IMPRISONMENT AT HARD LABOR.
Imprisonment at hard labor is a punishment rendering the crime for which it is inflicted "infamous," within the meaning of Const. U. S. Amend. 5, providing that no person shall be held to answer for a capital or otherwise infamous crime unless on presentment or indictment of a grand jury.

4. CHINESE—GEARY ACT—IMPRISONMENT AT HARD LABOR—CONSTITUTIONAL LAW.
So much of the Geary act of May 5, 1892, § 4, (27 Stat. 25,) as provides for the imprisonment at hard labor of all Chinese persons adjudged by a commissioner to be unlawfully in the United States, is void, under Const. U. S. art. 3, § 2, par. 3, and amendments 5 and 6, securing the right of trial by jury and other rights to persons criminally prosecuted by the United States.

Proceeding by the United States against Wong Dep Ken, a Chinese person alleged to be unlawfully in the United States. The commissioner sentenced defendant to imprisonment at hard labor and deportation. Defendant appealed to this court. A motion to dismiss the appeal was denied. 57 Fed. Rep. 203. The appeal is now on final hearing. Decree sentencing defendant to deportation only.

George J. Denis, U. S. Atty.

A. B. Hotchkiss, Thomas J. Riordan, and Francis J. Thomas, for defendant.

ROSS, District Judge. This is an appeal taken by the defendant, a Chinese person, from an order made by a court commissioner

for this district directing that he be imprisoned at hard labor in the state prison at San Quentin, and thereafter deported to China. The proceedings before the commissioner were commenced by the filing with him of a verified complaint charging that, after the passage of the act of congress entitled "An act to amend an act entitled 'An act to execute certain treaty stipulations relating to Chinese,'" approved May 6, 1882, (22 Stat. 58,) "one Ming Lee Tue did come into the United States from a foreign place, and, having come, has remained within the United States; that the said Ming Lee Tue has been found, and now is, unlawfully within the United States; and that at all the times herein mentioned the said Ming Lee Tue was and is a Chinese laborer."

Upon this complaint a warrant was issued by the commissioner, and the defendant, whose true name was found to be Wong Dep Ken, having been apprehended, an examination of the charge was had before the commissioner, who, after examination, found him to be a Chinese person and a laborer by occupation, and who found and adjudged him to be unlawfully within the United States, and therefore ordered:

"First. That said Wong Dep Ken be imprisoned at hard labor for the period of two (2) days at the state's prison of the state of California, at San Quentin, in said state of California.

"Second. That thereafter said Wong Dep Ken be removed from the United States to China; and I order that said deportation of the said Wong Dep Ken be made from the port of San Francisco, within the limits of the northern district of California; and I further order that said Wong D p Ken be, and he is hereby, committed to the United States marshal for the southern district of California for the purposes aforesaid."

The appeal was taken by virtue of the thirteenth section of the act of congress entitled "An act to prohibit the coming of Chinese laborers to the United States," approved September 13, 1888, (25 Stat. 476.) A motion made on behalf of the government to dismiss the appeal was recently denied by the court, for reasons given in an opinion filed on June 30th last. 57 Fed. Rep. 203. The appeal is now for disposition upon its merits.

It appears from the record that the commissioner found from the evidence adduced before him that the defendant is a Chinese person, and a laborer by occupation; that defendant failed to establish, by affirmative proof, to the satisfaction of the commissioner, his lawful right to remain in the United States; and that he did not make it appear to the commissioner that he (defendant) is a subject or citizen of any other country than China. Based upon these facts, the judgment and order appealed from were given, and they rest for their support upon the provisions of the act of congress entitled•"An act to prohibit the coming of Chinese persons into the United States," approved May 5, 1892, known as the "Geary Act," (Stat. 1891–92, p. 25.) The third section of that act is as follows:

"That any Chinese person or person of Chinese descent arrested under the provisions of this act or the acts hereby extended shall be adjudged to be unlawfully within the United States, unless such person shall establish, by

affirmative proof, to the satisfaction of such justice, judge, or commissioner, his lawful right to remain in the United States."

And its fourth section reads:

"That any such Chinese person or person of Chinese descent convicted and adjudged to be not lawfully entitled to be or remain in the United States shall be imprisoned at hard labor for a period of not exceeding one year, and thereafter removed from the United States, as hereinbefore provided."

—That is to say, as provided by the second section of the act, which is as follows:

"That any Chinese person or person of Chinese descent, when convicted and adjudged under any of said laws to be not lawfully entitled to be or remain in the United States, shall be removed from the United States to China, unless he or they shall make it appear to the justice, judge, or commissioner before whom he or they are tried that he or they are subjects or citizens of some other country, in which case he or they shall be removed from the United States to such country: provided, that, in any case where such other country of which such Chinese person shall claim to be a citizen or subject shall demand any tax as a condition of the removal of such person to that country, he or she shall be removed to China."

It will be observed that by the third section of the act of May 5, 1892, the burden of proof of his lawful right to remain in the United States is placed on the Chinese person or person of Chinese descent charged with being unlawfully in this country. No one questions the power of congress to prohibit the coming into this country of any class of foreigners deemed prejudicial to the interests of our people. Against the coming into the country of Chinese laborers, congress has been legislating for years. The reason for such legislation is an old story, and need not be repeated. But, notwithstanding the enactments upon the subject, the laws have been evaded in many ways. By false testimony and concocted evidence the courts have been imposed upon in cases almost without number, and by sea and land the prohibited class in large numbers have been smuggled into the country in one way or another. To prevent all of this, and give effect to its laws upon the subject, as far as possible, congress deemed it wise by the provision in question to put the burden of proof of his lawful right to remain in the United States on the Chinese person or person of Chinese descent charged with being unlawfully within their borders. To those not residents of and not familiar with the Pacific slope, and not so much subject to the evils intended to be guarded against by the exclusion acts, "the lines laid down for their enforcement may," as appropriately and well said by Judge Severens in the Case of Sing Lee, 54 Fed. Rep. 334, "seem hard; and because such summary dealings with the rights of persons are out of the common order to which we are accustomed, and are liable to produce injustice in many cases on account of their summary expedition and the presumption against the prisoners, they may seem severe; but, if the power resides in congress to enact such provisions, the discretion whether it will do so rests in the lawmaking power, and the courts must presume it was exercised upon sufficient reasons." In respect to the provision of the Geary act putting the burden of proof on those coming within the class

thus interdicted, I agree with Judge Severens in the case cited, that there is not only nothing in it violative of the provisions of the constitution of the United States, but, for the reasons given by him, and in view of the circumstances already referred to and of others that may be suggested, that the provision in question is not unreasonable. He says:

"The person brought before the commissioner is one of a class which, by the terms of the statute, is obnoxious to its operation. That must appear before the general jurisdiction can be exercised, and since, generally, that class is interdicted, he can only escape the common lot upon its appearing that he is not within the general condemnation. The means of showing this are presumably in his own control. It would be extremely inconvenient, and probably in most instances impracticable, for the government to bring proof of the negative fact that the respondent is not within the exemption. Such circumstances are the basis of the rule of evidence which devolves the burden on the party who presumably has the best means of proving the fact; but, whatever the rule which by the common law would be applicable to trials, it cannot be affirmed that in such conditions the legislature cannot prescribe such a rule of evidence."

That the expulsion from this country of a foreigner who came into it contrary to its laws, and who was thereby excluded, is not subjecting him to prosecution or punishment for crime, is clear. In the late case of Fong Yue Ting v. U. S., 13 Sup. Ct. Rep. 1016, the majority of the supreme court held that the subsequent expulsion of Chinese persons who came into the country by invitation of our government is not the prosecution or punishment of such persons for crime committed. A fortiori, the expulsion of such foreigners as entered the country contrary to and in the teeth of our laws is not to prosecute or punish them for crime committed. It results, I think, that the constitutional, statutory, and common-law provisions and rules in respect to criminal prosecutions have no application to the mere expulsion or deportation of such Chinese persons as came here contrary to and in violation of the laws of the United States.

But it by no means follows that the political right of the government to expel such persons embraces the right to confine them at hard labor in a penitentiary before deportation. If the imprisonment of a human being at hard labor in a penitentiary is not punishment, it is difficult to understand how anything short of the infliction of the death penalty is. It is not only punishment, but punishment infamous in its character, which, under the provisions of the constitution of the United States, can only be inflicted upon a person after his due conviction of crime pursuant to the forms and provisions of law.

"Infamous punishments," said the supreme court in Ex parte Wilson, 114 U. S. 426, 5 Sup. Ct. Rep. 935, "cannot be limited to those punishments which are cruel or unusual; because, by the eighth amendment of the constitution, 'cruel and unusual punishments' are wholly forbidden, and cannot therefore be lawfully inflicted, even in cases of convictions upon indictments duly presented by a grand jury. By the first crimes act of the United States, forgery of public securities, or knowingly uttering forged public securities with intent to defraud, as well as treason, murder, piracy, mutiny, robbery, or rescue of a person convicted of a capital crime, was punishable

with death. Most other offenses were punished by fine and imprisonment. Whipping was part of the punishment of stealing or falsifying records, fraudulently acknowledging bail, larceny of goods, or receiving stolen goods. Disqualification to hold office was part of the punishment of bribery; and those convicted of perjury or subornation of perjury, besides being fined and imprisoned, were to stand in the pillory for one hour, and rendered incapable of testifying in any court of the United States. Act April 30, 1790, c. 9, (1 Stat. 112–117;) Mr. Justice Wilson's Charge to the Grand Jury in 1791, 3 Wils. Works, 380, 381. By that act, no provision was made for imprisonment at hard labor. But the punishment of both fine and imprisonment at hard labor was prescribed by later statutes, as, for instance, by the act of April 21, 1806, c. 49, for counterfeiting coin, or uttering or importing counterfeit coin; and by the act of March 3, 1825, c. 65, for perjury, subornation of perjury, forgery and counterfeiting, uttering forged securities or counterfeit money, and other grave crimes. 2 Stat. 404; 4 Stat. 115. Since the punishments of whipping and of standing in the pillory were abolished by the act of February 28, 1839, c. 36, § 5, (5 Stat. 322,) imprisonment at hard labor has been substituted for nearly all other ignominious punishments, not capital; and by the act of March 3, 1825, c. 65, § 15, re-enacted in Rev. St. § 5542, any sentence of imprisonment at hard labor may be ordered to be executed in a state prison or penitentiary. 4 Stat. 118. What punishments shall be considered as infamous may be affected by the changes of public opinion from one age to another. In former times, being put in the stocks was not considered as necessarily infamous; and by the first judiciary act of the United States, whipping was classed with moderate fines and short terms of imprisonment in limiting the criminal jurisdiction of the district courts to cases 'where no other punishment than whipping, not exceeding thirty stripes, a fine not exceeding one hundred dollars, or a term of imprisonment not exceeding six months, is to be inflicted.' Act Sept. 24, 1789, c. 20, § 9, (1 Stat. 77.) But at the present day either stocks or whipping might be thought an infamous punishment. For more than a century, imprisonment at hard labor in the state prison or penitentiary or other similar institution has been considered an infamous punishment in England and America. Among the punishments 'that consist principally in their ignominy,' Sir William Blackstone classes 'hard labor, in the house of correction or otherwise,' as well as whipping, the pillory, or the stocks. 4 Bl. Comm. 377. And Mr. Dane, while treating it as doubtful whether confinement in the stocks or in the house of correction is infamous, says: 'Punishments, clearly infamous, are death, gallows, pillory, branding, whipping, confinement to hard labor, and cropping.' 2 Dane, Abr. 569, 570. The same view has been forcibly expressed by Chief Justice Shaw. Speaking of imprisonment in the state prison, which by the statutes of Massachusetts was required to be at hard labor, he said: 'Whether we consider the words "infamous punishment" in their popular meaning, or as they are understood by the constitution and laws, a sentence to the state prison, for any term of time, must be considered as falling within them. The convict is placed in a public place of punishment, common to the whole state, subject to solitary imprisonment, to have his hair cropped, to be clothed in conspicuous prison dress, subjected to hard labor without pay, to hard fare, coarse and meager food, and to severe discipline. Some of these a convict in the house of correction is subject to; but the house of correction, under that and the various names of "workhouse" and "bridewell," has not the same character of infamy attached to it. Besides, the state prison, for any term of time, is now by law substituted for all the ignominious punishments formerly in use; and, unless this is infamous, then there is now no infamous punishment other than capital.' Jones v. Robbins, 8 Gray, 329, 349. In the same case, Mr. Justice Merrick, while dissenting from the rest of the court upon the question whether, under the words 'the law of the land' in the constitution of Massachusetts, an indictment by a grand jury was essential to a prosecution for a crime punishable by imprisonment in the state prison, and taking a position upon that question more accordant with the recent judgment of this court in Hurtado v. California, 110 U. S. 516, 4 Sup. Ct. Rep. 111, 292, yet

concurred with the other judges in holding that such imprisonment at hard labor was an infamous punishment. 8 Gray, 370–372. Imprisonment at hard labor, compulsory and unpaid, is, in the strongest sense of the words, "involuntary servitude for crime,' spoken of in the provision of the ordinance of 1787, and of the thirteenth amendment of the constitution, by which all other slavery was abolished."

In the subsequent case of Mackin v. U. S., 117 U. S. 352, 6 Sup. Ct. Rep. 777, the court said:

"We cannot doubt that at the present day imprisonment in a state prison or penitentiary, with or without hard labor, is an infamous punishment."

Such punishment, as has been said, cannot be inflicted except for crime committed, and after due conviction thereof. By subdivision 3, § 2, art. 3, of the constitution of the United States, it is declared that "the trial of all crimes, except in cases of impeachment, shall be by jury."

By the sixth amendment of the constitution it is declared:

"In all criminal prosecutions the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the state and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor; and to have the assistance of counsel for his defense."

By the fifth amendment it is provided that:

"No person shall be held to answer for a capital or other infamous crime unless on presentment or indictment of a grand jury, except in cases arising in the land or naval forces, or in the militia, when in actual service in time of war or public danger."

The fifth amendment also provides that:

"No person shall be deprived of life, liberty, or property without due process of law."

That portion of section 4 of the act of May 5, 1892, known as the "Geary Act," providing for the imprisonment at hard labor for a period of not exceeding one year of any Chinese person, or person of Chinese descent, convicted and adjudged by a commissioner to be not lawfully entitled to be or remain in the United States, is, in my opinion, clearly in conflict with the provisions of the constitution of the United States above cited. I am unable to appreciate the force of the suggestion made by the district attorney that the provisions of the federal constitution apply only to citizens of the United States and to aliens permissively therein, and that its protections and safeguards cannot be invoked by an alien who came into and remains in the country in violation of the express laws of the country. One obstacle in the way of adopting that view is that it assumes the very question to be determined, namely, whether the defendant did come and remain in the country contrary to its laws. But, above and beyond that consideration, the constitution, which has potency everywhere within the limits of our territory, covers alike with its protection every human being within it. I do not understand that there is anything to the contrary in any of the opinions delivered in the case of Fong Yue Ting v. U. S., supra. An alien who comes into this country against the

consent of our government, and even contrary to a law expressly excluding him, does not thereby become an enemy of our country. Certainly, so long as he remains within our borders, and so long as our government remains on terms of peace and amity with the country of which he is a subject, he must be regarded as a friendly alien. If such an alien may be arbitrarily deprived of his liberty, surely he may be arbitrarily deprived of his property, and even of his life. Would any one contend that, if the present defendant should commit the crime of murder within the United States, the constitution of these states would not secure to him a trial by jury, and any and every other right thereby guarantied to any other person charged with a similar offense? Certainly not. In the case of Taylor v. Carpenter, 3 Story, 458, which arose in 1844, the defendant objected to the maintenance of the suit on the ground, among other grounds, that the plaintiffs were aliens. But Judge Story answered:

"Be it so; but in the courts of the United States, under the constitution and laws, they are entitled, being alien friends, to the same protection of their rights as citizens. * * * There is no difference between the case of a citizen and that of an alien friend where his rights are openly violated."

In the case of Ah Kow v. Nunan, 5 Sawy. 562, Mr. Justice Field, referring to the fourteenth amendment of the constitution of the United States, said:

"That amendment, in its first section, declares who are citizens of the United States, and then enacts that no state shall make or enforce any law which shall abridge their privileges and immunities. It further declares that no state shall deprive any person (dropping the distinctive term 'citizen') of life, liberty, or property without due process of law, nor deny to any person the equal protection of the laws. This inhibition upon the state applies to all the instrumentalities and agencies employed in the administration of its government, to its executive, legislative, and judicial departments, and to the subordinate legislative bodies of counties and cities; and the equality of protection thus assured to every one whilst within the United States, from whatever country he may have come, or of whatever race or color he may be, implies not only that the courts of the country shall be open to him on the same terms as to all others for the security of his person or property, the prevention or redress of wrongs, and the enforcement of contracts, but that no charges or burdens shall be laid upon him which are not equally borne by others, and that in the administration of criminal justice he shall suffer for his offenses no greater or different punishment. Since the adoption of the fourteenth amendment, congress has legislated for the purpose of carrying out its provisions in accordance with these views. The Revised Statutes, re-enacting provisions of law passed in 1870, declare that 'all persons within the jurisdiction of the United States shall have the same right in every state and territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property, as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.' Section 1977. They also declare that 'every person who, under color of any statute, ordinance, regulation, custom, or usage of any state or territory, subjects, or causes to be subjected, any citizen of the United States, or other person within the jurisdiction thereof, to the deprivation of any rights, privileges, or immunities secured by the constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.' Section 1979. It is certainly something in which a citizen of the

United States may feel a generous pride that the government of his country extends protection to all persons within its jurisdiction, and that every blow aimed at any of them, however humble, come from what quarter it may, is 'caught upon the broad shield of our blessed constitution and our equal laws.' "

The invalidity of that portion of section 4 of the Geary act providing for the imprisonment at hard labor for a period of not more than one year of the Chinese person or person of Chinese descent found and adjudged to be unlawfully within the United States does not, however, affect the deportation clause of the section, nor any of the othe provisions of the act. There is no necessary connection between the deportation of the person and his imprisonment at hard labor for one year, or for any less time. The unconstitutionality of an independent clause of a statute does not render unconstitutional the remainder of the statute.

From the views above expressed, it results that that portion of the order of the commissioner directing that the defendant be imprisoned at hard labor in the state prison at San Quentin for two days should be annulled, and that in all other respects the judgment and order should be affirmed.

Ordered accordingly.